Filed 12/22/15  P. v. Ford CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAHEEM D. FORD,<br><br>    Defendant and Appellant. | B256645<br><br>(Los Angeles County<br>Super. Ct. No. TA125906) |

APPEAL from a judgment of the Superior Court of Los Angeles County. John T. Doyle, Judge.  Affirmed.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Raheem D. Ford of attempted voluntary manslaughter as a lesser included offense in count 2 and found that he personally used a firearm in the commission of the offense. (Pen. Code, §§ 664/192, subd. (a), 12022.5.)[1] The trial court sentenced defendant to a total term of 15 years and six months in state prison. The sentence consisted of the upper term of five years and six months for count 2 and a subsequent 10 years for the use of a firearm.

Defendant appeals on the grounds that: (1) the trial court committed prejudicial error by instructing the jury with CALCRIM No. 361; and (2) the trial court erred in imposing the upper term for the substantive offense and the firearm enhancement.

## FACTS

**Prosecution Evidence**

Charisse and Eddie Muhammad lived in a home on Coslin Avenue in Carson. They shared the home with Charisse's daughters, Camille and Monique Bray, and her granddaughters, Nyla Muhammad and Samoya Horton.[2] Monique met defendant approximately four years before trial, when she was 15. They both were attending a Muslim school. In July 2012, Monique and defendant had a baby daughter, Nyla. On November 22, 2012, Thanksgiving Day, both Eddie and Monique were injured by shots fired by defendant.

During his relationship with Monique, there were times when defendant was abusive to her. In October 2011, defendant became upset with Monique because he thought she was lying to him about where she had been. He hit her twice in the face. On another occasion, defendant went to Monique's school and followed her to a doctor's appointment. On the way, he argued with her and called her names. He tried to push her into the street and take her phone. At the hospital, he called her a "bitch" and spat in her

---

**1** All further references to statutes are to the Penal Code unless stated otherwise.

**2** We refer to some of the individuals who testified by their first names, since some of them share surnames.

face. In July 2012, Charisse was awakened by a noise and found that a rock had been thrown through the window of a bedroom that had previously been Monique's. A few weeks after the window was broken, defendant came to Charisse's home and offered money "for the window."

In October 2012, Detective Pedro Montez of Buena Park Police Department met with defendant's mother, Keisha Crawford, at her request. She played two voicemails for him that were left by defendant. Detective Montez contacted Charisse and played the voicemail messages for her over the phone. The messages were played for the jury. In the first message, defendant said he knew Crawford was speaking ill of him to Monique's family so that he could not see his own daughter. He said "Fuck you. And fuck, and fuck that little baby man I don't even wanna see 'em no more." In the second message, defendant said he was going to use his financial aid money to buy a gun and kill Charisse and her daughter. Monique soon obtained a restraining order against defendant. While at the courthouse for the hearing on the restraining order, Eddie told defendant to leave Monique alone. Defendant responded in a disrespectful manner using "bad words."

A few weeks before the shooting, Monique asked Eddie to pick her up from Everest College in Torrance. While sitting in his truck and waiting for Monique, Eddie saw defendant hiding in the bushes. Defendant looked in Eddie's direction and then moved away. His hand was in his hoody pocket. Because Eddie thought defendant might have a gun, Eddie grabbed a tire iron from the back of his truck and let defendant know that he did not like what defendant was doing. Eddie was referring to defendant's threats and harassment toward Monique. When Monique came out, defendant walked away.

Monique texted her teacher at college, Janel Spafford, that she could not come to class on the last session before Thanksgiving because her child's father was threatening her. During class on that day, defendant entered the classroom and began asking questions about where he could find Monique.

Shortly before Thanksgiving, defendant and Monique reconciled and visited his grandmother's house together with the baby, where they met other members of

3

defendant's family. Defendant and Monique were invited back for Thanksgiving Day, and they accepted the invitation. Defendant was to go to Monique's house and pick her up. By the time Thanksgiving Day came, Monique did not want to talk to defendant, despite their earlier plans, because they had been arguing via text messages. Monique told defendant she did not wish to see him anymore. Defendant had been saying he was going to kill her or one of her family members in his texts because "he just wanted to see Nyla."[3]

Defendant had always entered Monique's home through her bedroom window, and as he began to do so on Thanksgiving morning, Monique became aware he was about to enter. She picked up Nyla and went to her mother's room. Monique told her mother that someone was at her window.

Charisse and Eddie had been awake since a little before 5:00 a.m. to say their prayers. Charisse recalled that, shortly after they began, Monique knocked on the door, and Charisse opened it. Monique was holding Nyla and seemed afraid. She said that her window "was being opened." Charisse asked Eddie to stop praying, but he refused. Monique waited for them inside their room. When Eddie was done praying, he told Charisse to call the police.

After calling 911, Eddie, Charisse, Monique, and Nyla waited in the living room. The police arrived within a few minutes. Eddie told the officers that defendant was trying to come inside the house. The police went to look for defendant. Monique went outside and noticed that her bedroom window screen was "kind of up." Charisse and Monique remained in the living room, and Monique's sister Camille came out and took

---

[3]     Among the text messages were the following: "Let's talk about it. If I don't go, they just going to take my money, give me no visitation, and I'm going to [] fucking kill you. Think I'm playing? You trying to fuck up my life." Also, "You fucking with the wrong nigga, like, on God," and "Monique, watch. You wish you would have talked to me. You've taken my daughter who I love away from me. Watch me get revenge and take you or someone in your family you love. This is no game. You'll see. If you just don't talk to me one fucking time."

4

Nyla to the back of the house. When Charisse and Monique heard a noise coming from Monique's bedroom, they told Eddie. Eddie opened the door to Monique's bedroom and said there was no one inside. As he closed the door and began walking back out, Charisse saw defendant come out of the room with a gun and point it at Eddie's chest. Eddie put up his hands. Eddie testified that he was shot in the abdomen as he passed over the threshold. Charisse heard approximately five to six shots. Defendant shot Eddie once and then "just kept shooting." Eddie was shot on the left side of his stomach, left thigh, and left shoulder. Monique recalled defendant continuing to shoot as Eddie was falling to the ground. Los Angeles County Sheriff's Deputy Annie Ng, who had just returned to the patrol vehicle outside the house, heard one single gunshot followed by four more gunshots and a female voice screaming.

Charisse recalled Eddie trying to get the gun from defendant. Although he had been shot, Eddie was able to get a grip on defendant, but defendant slipped away. Before he began falling down, Eddie picked up a small chair and tried to throw it toward defendant. Eddie began to move toward the front door, and Charisse went to join him. As Charisse met up with her husband near the front door, she felt two bullets passing by her head. Eddie struggled with the door and was eventually able to open it. He went out and lay on the ground. Charisse followed him but went back inside because her two daughters and granddaughter were still inside.

Camille recalled that she was in her bedroom putting Nyla to sleep when she heard what sounded like four to five gunshots. Monique ran into Camille's room screaming and hid behind Camille. Defendant, who looked angry, came in the room and walked towards Monique with the gun pointed toward her. He did not ask about Nyla. Camille grabbed defendant by the neck and seized the barrel of the gun. Camille and defendant fell on the floor, and Nyla fell on the bed. Camille was underneath defendant, holding the barrel of the gun and pointing it toward the closet. Defendant was firmly holding the other end. Monique got on top of defendant while screaming. Defendant bit Camille on the arm.

Charisse heard the noise coming from Camille's bedroom and entered to find defendant, Camille, and Monique struggling. Charisse thought Nyla might be beneath them and jumped on top of them and began pulling them apart. When everyone got up, Charisse realized Nyla was not underneath and she began pulling everyone out into the hallway, toward the kitchen and front door. They were all in a huddle, continuing to struggle. During the struggle, defendant twice said, "I want to kill myself." When they got to the doorway, Charisse was able to grab the gun and throw it outside. Charisse called out to the police, "You can come and get him. He doesn't have a gun." Defendant yelled out that he did have a gun. Charisse held onto defendant until the deputies arrived and arrested him.

Deputy Jesus Argueta arrived to find Eddie lying on the grass. He saw two females holding down defendant on the porch. Defendant was arrested and taken to a patrol car. Deputy Argueta went inside the house and found Nyla on the bed in the northwest bedroom. He saw several casings and blood on the floor and walls of the hallway and kitchen area.

Paramedics treated Monique for two gunshot wounds in the buttocks. One was an entry wound and one was an exit wound, and she was obliged to undergo surgery. The paramedics also treated Eddie, who was hospitalized for 30 to 40 days. Eddie had eight gunshot wounds.

A criminalist with the Los Angeles County Sheriff's Department examined the firearm and bullet fragments found at the scene. The firearm, found under a tree in front of the house, was a .45-caliber Norinco Model 1911. The gun's magazine was empty. One of its safety mechanisms was the grip safety. If the trigger was pulled without holding down the grip safety, the gun would not fire. It would require deliberate action both on the pressure and on the trigger to fire the gun. The gun had the capacity to hold eight bullets in the magazine with an extra round in the chamber, for a total of nine rounds. Four bullets, two bullet fragments, six bullet casings, and one live round were found, and all came from the gun located at the scene.

**Defense Evidence**

Dr. Bruce Krell, a Ph.D. in applied mathematics, is a licensed firearms dealer, gunsmith, and ballistics research engineer. He was called to testify as an expert in the area of trajectories and firearms operations. Dr. Krell testified regarding a hypothetical wherein the defendant was scooting under the bed when the gun went off, and he was exiting the room through the kitchen to go through the back door when he was hit with a chair. It was assumed the defendant put his hands up and shot the gun at the chair, and the victim and the accused then tussled as the victim tried to wrest the gun from the accused. The victim and the accused moved together towards the front door. Hypothetically, the victim broke the glass of the door and exited. Krell was of the opinion that the bullet trajectories found in the house were consistent with the hypothetical facts provided by the defense. Dr. Krell stated that when untrained persons pick up a firearm, they put their fingers on the trigger. In a struggle, they do not let go but rather grip harder, and an unintended trigger-finger response causes them to press the trigger.

Defendant testified that he is five feet four and one-half inches in height, and he weighed 111 pounds at the time of the shooting.[4] He met Monique at an Islamic private school in 2008 or 2009, and they began dating during the summer of 2011. His sexual relationship with Monique was his first. In August 2011, he began sleeping at Monique's house. He would enter through her bedroom window because she was not allowed to have company over, "especially a guy." Defendant brought clothing to her house, and he ate and showered there when Monique's parents were not home. They talked about getting married and having a family. That was what they practiced doing. They decided not to have protected sex because they intended to have a child together.

In October 2011, defendant was planning to fly to Cincinnati with his uncle. He asked Monique to gather his things because Eddie was home. Monique became upset

---

[4]     Eddie testified that he measured five feet 11 inches and, at the time of the shooting, he weighed approximately 170 pounds.

and refused. She was screaming in his face, and defendant shoved her twice in the face. The police were called, and defendant was arrested for hitting Monique.

In November 2011, defendant was jumped by gang members who knocked him unconscious in Buena Park, where he was living with his mother. Defendant was also harassed by gang members in Carson on his way to Monique's house. He felt his life was in danger because he was always on his own, and he obtained a gun from a friend. Defendant would give this friend money "here and there" in exchange for using the gun. Defendant admitted he lied when he told the detective that he had found the gun in some bushes.

Defendant found out about Monique's pregnancy at the beginning of December 2011. Monique's parents were upset with defendant more than with Monique. On the day defendant learned of Monique's pregnancy, defendant and Monique argued over defendant telling Charisse that he was still seeing Monique. Monique stopped answering defendant's calls. Charisse threatened to kick Monique out of the house if she continued to have contact with defendant. Defendant felt bad about not being there for the child they had planned to have. On New Year's Eve 2011, Monique answered defendant's telephone call and defendant went to the house. They talked all night. After that, Monique ignored him again.

Defendant moved to Ohio and was there from approximately the end of February to the beginning of April 2012. During that time, he had no contact with Monique and used Twitter to see what was happening with the pregnancy. He felt hurt. When he returned from Ohio, Monique was approximately six to seven months pregnant.

Charisse told defendant he had to talk to Eddie "to arrange things." In April or May 2012, defendant went to talk to Eddie in person and found him using a leaf blower in the yard. Eddie brought up the incident in which defendant had pushed or hit Monique. Eddie raised the leaf blower and said he should hit defendant with it. Eddie began talking about how he had done "things in his life" and had gone to prison for murdering someone. Defendant was scared. Eddie told defendant to go, and defendant left.

8

When Monique was approximately seven to eight months pregnant, defendant learned she was attending Everest College. He went to her school to find out what was going on. Defendant was not hiding in the bushes while waiting for Monique, as Eddie had testified. Defendant and Monique were talking about the baby when Eddie arrived to pick up Monique. Monique ended their conversation and got into Eddie's vehicle. Eddie pulled up alongside defendant and yelled at him, "Why are you here?" Eddie stopped his vehicle and came out with a tire iron. Defendant ran away out of fear. He felt embarrassed for running away in front of Monique. Defendant did not have a gun at the time, and he did not try to suggest he had one by putting his hand in his pocket, as Eddie stated.

Defendant told Charisse he wanted to be involved with the baby, and she said he had to pay for the window he had broken. Defendant went to the house with $175 for the window and rang the bell. No one answered, but he saw someone pass by inside and he heard Nyla crying. Defendant said aloud that he knew someone was in there, and Charisse told him he had to talk to Eddie. Defendant was angry and made some comments to her out of anger.

Approximately three weeks before the shooting, defendant telephoned Eddie in the presence of his aunt, Christy Williams. She saw defendant become agitated. Defendant was repeating what Eddie was saying to him. Eddie said if defendant and the baby came to the house, Eddie was going to beat his head in with a bat.

Defendant and Monique met in court when she sought full custody of Nyla, which he did not oppose, and she and defendant made informal arrangements for defendant to see the baby. They met on Monique's last day of school and went out to eat. They had sexual intercourse in the restaurant's bathroom. Monique and defendant agreed that he would see his daughter for the first time on the following day. Defendant met Monique and the baby near Monique's home. Defendant, Monique, and the baby met for the next several days.

Three days before Thanksgiving, defendant and Monique went to his grandmother's house. Monique enjoyed herself, and everyone was happy. Defendant

9

and Monique talked about getting married and having more children. Defendant's grandmother invited Monique and defendant for Thanksgiving, and they both accepted. Defendant said he would pick up Monique at her house.

Defendant acknowledged vandalizing his mother's car by cutting the word "bitch" on it. He was upset because his mother would not intervene with Charisse so that defendant could see his daughter. Two days before Thanksgiving, he left some hateful text messages for his mother. Defendant explained that his drug use affected him. To get away from the pain he was suffering, he would use marijuana and Ecstasy pills. Monique and he had argued over her talking to two of her ex-boyfriends and "doing things with them while she was pregnant." The drugs intensified his anger. He did not intend to carry out any of the threats of killing people that he made in his text messages.

Defendant and Monique argued before the planned Thanksgiving visit to his grandmother's home. Defendant was angry with her up until the night before Thanksgiving, but on that morning he was in a different mood and wanted to spend his first holidays with his daughter and Monique, as had been planned. He took a train very early in the morning so as to get to her house before she made other plans. Defendant knocked on Monique's window and saw the curtain move. Defendant opened the window and saw Monique with the baby. As defendant climbed through the window, Monique took the baby and left. Defendant believed she was going to come back. He took his sweater and shoes off, sat on the bed, and began scrolling through his phone. Defendant waited for approximately 10 to 20 minutes and wondered why Monique had not returned.

Defendant heard voices in the hallway and living room. Family members were talking about someone breaking into the house, and defendant heard his name. Defendant was afraid and did not know what to do. He then heard Eddie's angry voice saying, "If I find that brother in the house, I'm going to send him straight to hell where he belongs." Defendant lay down beside Monique's bed so he would not be seen by anyone who looked into the room. The gun was in his waistband. Defendant heard Eddie open the door and turn on the light. Eddie said that no one was in the room. Defendant saw

10

Charisse's shoes as she also walked into the room, and then he heard the police at the front door. He heard Eddie telling the police, "If I find him in the house, I'm going to hurt him." Defendant planned on going out the window when the police left, but they did not leave. Defendant was afraid of Eddie because of his threatening statements regarding defendant and the fact that Eddie had killed someone in the past.

Defendant decided to go completely under the bed to be well hidden, but he found he could not fit because of the gun in his waistband. Defendant pulled the gun out and held it in his hand. He did not notice if the safety was on. As he tried again to slide under the bed, the gun discharged accidentally. Defendant panicked and decided to run out of the house through the back door near the kitchen. As he was running out of Monique's room, he saw something coming toward him in his peripheral vision. It was Eddie holding a chair. The chair struck defendant on his side and on his head and neck area. His natural reaction was to put up his hands, and as he did so, he fired the gun. He did not intend to fire the gun, and he did not even see Eddie clearly. As the chair hit defendant, Eddie grabbed his neck and tried to get the gun. As they were tugging and pulling, the gun was firing. Defendant was pulling the trigger continuously throughout this time. He never saw Eddie put up his hands and walk backwards away from him.[5] The entire time they struggled, Eddie was saying he was going to kill defendant. Defendant was firing the gun because he knew that if Eddie had taken it away from him, Eddie could have killed him. Defendant was not aware that Eddie had been shot because Eddie just kept on coming at him. It seemed to defendant that Eddie let him go after all the shots were fired, and Eddie went out through the front door.

After the gun ran out of bullets, defendant was in shock. Defendant wondered if anything had happened to the baby, so he walked to Camille's bedroom. As defendant entered the bedroom, Camille grabbed the gun. Defendant had not been pointing it at her and Monique. Defendant wanted to keep the gun and point it at police so that they would

---

[5]     Eddie testified that he backed up after he was shot the first time and went toward the door.

11

kill him.  Defendant told Camille to let go of the gun so that he could kill himself.
Monique jumped on his back, saying she did not want him to do so.  He did not go to
Monique's home with the intention of hurting anyone that day.

**DISCUSSION**

## I. CALCRIM NO. 361

### A.  Proceedings Below

The trial court read CALCRIM No. 361 as follows:  "If the defendant failed in his
testimony to explain or deny evidence against him, and if he could reasonably be
expected to have done so based on what he knew, you may consider his failure to explain
or deny in evaluating that evidence.  Any such failure is not enough by itself to prove
guilt.  [The] People must still prove him guilty beyond a reasonable doubt.  If the
defendant failed to explain or deny, it is up to you to decide the meaning and importance
of that failure."

The record reveals that no mention was made by either party regarding CALCRIM
No. 361 during the conference on jury instructions.  At the close of the conference, the
trial court asked the parties, "With that are there any other objections or deletions or
additions to the jury instructions as we've covered?"  Both the prosecutor and defense
counsel responded that they had nothing further to add to the discussion.

### B. Defendant's Argument

Defendant contends that the reading of CALCRIM No. 361 unfairly called into
question his credibility, and it was not supported by the evidence.  This instruction should
only be given when the prosecutor has advised the court and the defendant of the basis
for giving the instruction.  The record contains no mention of a specific omission or of a
failure to deny by defendant.  The error was prejudicial and resulted in a denial of a fair
trial and due process.

### C.  Relevant Authority

In criminal cases, """"the trial court must instruct on the general principles of law
relevant to the issues raised by the evidence.  [Citations.]""""  (*People v. Breverman*
(1998) 19 Cal.4th 142, 154; *People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*).)  The

12

trial court has the corresponding duty "'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.'" (*Saddler*, at p. 681.)

A claim of instructional error is subject to independent review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469 (*Lamer*).) Failure to object to the giving of an instruction in the trial court forfeits the issue on appeal unless giving the instruction affected the defendant's substantial rights. (§ 1259; *People v. Virgil* (2011) 51 Cal. 4th 1210, 1260; *People v. Battle* (2011) 198 Cal.App.4th 50, 64-65.)

### D. Analysis

As noted, defendant raised no objection below, but claims error in the giving of CALCRIM No. 361. Defendant's failure to object to the instruction forfeits the claim on appeal. (*People v. Virgil*, *supra*, 51 Cal. 4th at p. 1260.) In any event, the claim fails on the merits, and any theoretical error was harmless.

CALCRIM No. 361 is similar in content to CALJIC No. 2.62, which was upheld by the Supreme Court in *Saddler*, *supra*, 24 Cal.3d at pages 680-681.[6] Cases analyzing the propriety of giving CALJIC No. 2.62 have held that the instruction should be given

---

[6] CALJIC No. 2.62 was read in pertinent part to Saddler's jury as follows: "If you find that [defendant] failed to explain or deny any evidence or facts against him which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable. In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence. The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt." (*Saddler*, *supra*, 24 Cal.3d at p. 677, fn. 4.)

13

when there are facts or evidence in the prosecution's case, within the defendant's knowledge, that the defendant did not explain or deny.  (See, e.g., *Lamer*, *supra*, 110 Cal.App.4th at p. 1469.)  Absent such circumstances, the instruction should not be given regardless of "how improbable that explanation may appear."  (*People v. Kondor* (1988) 200 Cal.App.3d 52, 57 [addressing CALJIC No. 2.62].)  Conflict between a defendant's testimony and that of prosecution witnesses is not a failure to explain or deny.  (*Saddler*, *supra*, 24 Cal.3d at p. 682.)

At the outset, we agree with respondent that there was some evidentiary basis for giving CALCRIM No. 361.  It has been held that the instruction is appropriately given when a defendant's testimony, although superficially accounting for the defendant's conduct, nonetheless appears strange or implausible.  (See *People v. Belmontes* (1988) 45 Cal.3d 744, 784 [addressing CALJIC No. 2.62], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Respondent points out that defendant's tactic of blaming some of his actions on drug use was implausible.  Defendant testified that using marijuana and Ecstasy helped him "chill," but he also testified that he sent threatening text messages that he did not mean due to being under the influence of marijuana and Ecstasy, which caused him to be angry.  He also testified that he became irritated and did "stupid things" when he did not use the two drugs.  Respondent also points out that defendant failed to explain why he threatened to use his financial aid money to buy a gun when he had testified that he had an arrangement with a friend that allowed him to use the friend's gun whenever he wanted.  In addition, defendant claimed his presence in Monique's bedroom became known because he dropped his cell phone. A photograph of the room that was shown to defendant at trial revealed that defendant's phone was lying on the bed.  When asked for an explanation, defendant could not provide one.  Given these instances of implausible testimony, we cannot say that the instruction at issue was given in error.  There was at least some basis for instructing the jury to consider these questionable aspects of defendant's version of events.

Furthermore, the reading of the instruction could not have prejudiced defendant in any way.  In *Saddler*, the court rejected an argument that CALJIC No. 2.62 violated due

14

process rights by denying a defendant the presumption of innocence and raising an inference of guilt. (*Saddler*, *supra*, 24 Cal.3d at pp. 679-680.) The court emphasized that the instruction cautions that the failure of a defendant to deny or explain "'does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of defendant beyond a reasonable doubt.'" (*Id*. at p. 680.)

CALCRIM No. 361 likewise contains cautionary language, telling the jury that a failure to explain or deny "is not enough by itself to prove guilt. The People must still prove him guilty beyond a reasonable doubt." It further instructs the jury, "If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure." Therefore, the presumption of innocence is an integral part of CALCRIM No. 361. Although the language of CALCRIM No. 361 differs somewhat from CALJIC No. 2.62, the reasoning of the Supreme Court in *Saddler* applies with equal force to CALCRIM No. 361. The language preserving the presumption of innocence and explaining the prosecution's burden of proof appears in each. Indeed, the language of CALCRIM No. 361 is much more beneficial to defendants than the instruction given in *Saddler*, which informed the jury that an unfavorable inference was the more probable inference to be drawn from any failure to explain.

Defendant, however, maintains that his testimony was singled out for special adverse scrutiny and consideration, and that this unfairly indicated to the jury that he was lying or incomplete in his testimony as opposed to members of the Muhammad family. The *Saddler* court rejected a similar argument that CALJIC No. 2.62 should never be given because it "impermissibly singles out a defendant's testimony and unduly focuses upon it." (*Saddler*, *supra*, 24 Cal.3d at p. 680.) The court cited its decision in *People v. Mayberry* (1975) 15 Cal.3d 143, stating, "The same argument was rejected in *People v. Mayberry*, *supra*, 15 Cal.3d 143, 161. We noted there that the instruction was consistent with Evidence Code section 413 which permits the drawing of inferences from any party's failure to explain or deny evidence against him. Since the only testifying 'party'

15

in a criminal case is the defendant, the code section can have reference only to him." (*Saddler*, *supra*, 24 Cal.3d at pp. 680-681, fn. omitted.)

Defendant also complains that neither the prosecutor nor the court offered an explanation for requesting or reading the instruction, and no discussion took place. It has been suggested that it would be unwise for a trial court to give the instruction without a specific showing that, *"'[T]here is some specific and significant defense omission that the prosecution wishes to stress or the defense wishes to mitigate.'"* (*Lamer*, *supra*, 110 Cal.App.4th at pp. 1469-1470.) *Lamer* did not state, however, that such a showing is a prerequisite to giving the instruction. Although the trial court here did not discuss this instruction during the jury instruction conference, on a silent record we presume that the court followed the law. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.)

In addition, the trial court instructed the jury under CALCRIM No. 200 that some of the instructions might not apply and that the jury must not assume that, because the court gave a particular instruction, it was suggesting anything about the facts. (See, e.g., *Saddler*, *supra*, 24 Cal.3d at p. 684; *Lamer*, *supra*, 110 Cal.App.4th at p. 1473.) This instruction diminished any prejudicial effect of CALCRIM No. 361. (*Saddler*, at p. 684; *Lamer*, at p. 1472.) CALCRIM No. 200 also told the jury to consider all of the instructions together. Thus, CALCRIM No. 361 did not impermissibly focus the jury on defendant's testimony. Furthermore, CALCRIM No. 226 instructed the jury to use its common sense and experience and to judge the testimony of each witness by the same standards. The same instruction directed the jury to consider whether the defendant's testimony was reasonable when considered with all the other evidence in the case. Clearly, CALCRIM No. 361 merely states in a different way the common sense approach to evaluating evidence that is urged upon jurors in other instructions, such as CALCRIM No. 226, which sets out factors for consideration in evaluating a witness's testimony. It is presumed that jurors are "able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

In addition, there was compelling evidence of defendant's guilt of attempted voluntary manslaughter at a minimum, and the prosecutor's closing argument did not emphasize the concept contained in CALCRIM No. 361 or argue that defendant failed to explain or deny any fact at trial. The prosecutor emphasized that the bullet holes, the pressure required to fire the gun, and the threatening voicemails left by defendant revealed the intent to kill Eddie and Monique.

Although defendant contends that calling into question the veracity of his testimony was particularly devastating in his case, since he alone supported his defense to the charges (accident and self-defense), defendant himself damaged his credibility by acknowledging that he lied repeatedly to the detective who interviewed him after the shooting incident. These lies were much more obvious to the jury than anything CALCRIM No. 361, buried among many criteria for evaluating credibility, might call into question.

We conclude it is not reasonably probable that defendant would have obtained a more favorable result in the absence of the alleged error. (*Lamer*, *supra*, 110 Cal.App.4th at p. 1473; *People v. Watson* (1956) 46 Cal.2d 818, 836.) To the extent defendant contends the alleged instructional error resulted in constitutional error because it called into question the presumption of innocence and denied him his due process right to a fair trial, we are certain beyond any reasonable doubt that the result of defendant's trial would have been the same had the trial court not instructed with CALCRIM No. 361. As in *People v. Haynes* (1983) 148 Cal.App.3d 1117, 1122, the jury here "closely evaluated the evidence and afforded [defendant] the benefit of all reasonable doubt," as demonstrated by their verdict of "not guilty" of attempted murder in count 2 and burglary in count 3.

## II. Failure to Expressly Recite Reasons for Upper Term

### A. Defendant's Argument

Defendant contends for the first time on appeal that the trial court failed to state reasons on the record for imposing the upper term in the attempted voluntary manslaughter count and the firearm enhancement.

### B.  Relevant Authority

Voluntary manslaughter is punishable by imprisonment for three, six, or 11 years. (§ 193, subd. (a).)  When a statute specifies three possible terms of imprisonment, the choice of the appropriate term rests within the sound discretion of the court.  (§ 1170, subd. (b).)  Section 1170, subdivision (b) provides that "[t]he court shall set forth on the record the reasons for imposing the term selected . . . ."  Section 1170, subdivision (c) reiterates:  "The court shall state the reasons for its sentence choice on the record at the time of sentencing."

### C.  Proceedings Below

At the start of the sentencing proceeding, the trial court stated it had read the sentencing memoranda filed by the People and by the defense, with accompanying attachments, including a letter by Monique.  The court asked if anyone wished to be heard.  Before allowing statements by defendant's mother and Monique's parents, the court heard defense counsel's request for a new trial based on a letter submitted by Monique, in which she apparently claimed to have perjured herself.  The court denied the motion.  The court stated it would take into consideration the statements made by Charisse and defendant's mother.

In pronouncing sentence, the court stated, "The court's read and considered the moving papers by the parties, the letters filed by the parties.  Probation is denied.  The court selects the high term of five years six months, and additional 10 years for the 12022.5, consecutive, for a total of 15 years, six months."

### D.  Analysis

"[T]he waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices.  Included in this category are cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons."  (*People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*).)

18

Pursuant to *Scott*, defendant forfeited any sentencing claim on appeal because he did not object to the court's failure to state the reasons for the imposition of the aggravated terms during the sentencing hearing. (*Scott*, *supra*, 9 Cal.4th at pp. 353, 356.) In attempting to defeat forfeiture, defendant claims the trial court "did not invite argument on the factors in aggravation and mitigation." The record shows that after stating it had read the sentencing memoranda, the court asked if anyone wished to be heard. Defense counsel voiced only defendant's request for a new trial, in which she herself did not join. After all of the impact statements and defendant's statement were heard, a discussion was held off the record. After that discussion, the court immediately imposed sentence, as quoted *ante*, and asked for the number of credits. At that point, defense counsel had an opportunity to speak and ask the court to explain its sentence, but counsel did not do so. We disagree with defendant's claim that his counsel had no opportunity to object. Had counsel specifically objected to the high terms, the court undoubtedly would have corrected the omission. (See *Scott*, at p. 353.)

Furthermore, any error was harmless. "[W]here the sentencing court fails to state . . . reasons, remand for resentencing is not automatic; we are to reverse the sentence only if 'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.'" (*People v. Sanchez* (1994) 23 Cal.App.4th 1680, 1684.) Defense counsel's sentencing memorandum was principally devoted to lengthy discussions of mitigating factors related to defendant and the circumstances surrounding the offense. Counsel discussed defendant's lack of any prior felony convictions and insignificant criminal record, Eddie's anger and conduct on the morning of the shooting, the fact that the crime was an unusual circumstance unlikely to reoccur, the fact that defendant's sole object was to be a father to his firstborn child, defendant's mental condition of depression and desperation, and his early acknowledgement of wrongdoing. Counsel also pointed out the letters attesting to defendant's good moral character and documents reflecting his academic excellence. The court stated it had considered this memorandum.

The prosecutor's sentencing memorandum set out the aggravating factors and asserted there were no factors in mitigation. Among the aggravating factors, the prosecutor cited defendant's prior incidents of violence toward Monique, as revealed by the testimony. The prosecutor noted the vandalism of the Muhammad home and defendant's threats to kill Monique Bray and members of her family. The prosecutor added that the Muhammads were vulnerable and targeted victims, who were in their own home at 5:00 a.m. when defendant surreptitiously entered the home armed with a gun. Eddie Muhammad had to undergo surgery, and he still had bullet fragments in his body.

A single valid factor is sufficient to support the trial court's sentencing choice. (*People v. Osband* (1996) 13 Cal.4th 622, 728; *People v. Steele* (2000) 83 Cal.App.4th 212, 226.) Any of the aggravating factors mentioned in the People's sentencing memorandum was sufficient to support the trial court's imposition of the high term. Our examination of the documents considered by the court indicates that it is not reasonably probable that the trial court would have been unable to state adequate reasons for imposing the upper terms in count 2 and the firearm enhancement. Therefore, any error in failing to state the reasons for the sentencing choice was harmless and remand for a new sentencing hearing is not required.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

20